CASE 57.—PROSECUTION AGAINST ALEX BURNS FOR MUR-
    DER.—January 26, 1910.

## Burns v. Commonwealth

Appeal from Clay Circuit Court.

WILLIAM LEWIS, Circuit Judge.

Defendant convicted, and appeals.—Affirmed.

1.  Homicide—Instructions—Applicability to Evidence.—Where
    there was evidence that deceased was helplessly drunk, and
    that accused, after disarming him of a pistol, could have kept
    out of his way or disarmed him of a small pocket knife, and'
    thereby avoided the killing, the giving of instructions as to
    murder was not error.
2.  Homicide—Evidence—Sufficiency—Malice.—Malice  may  be
    proved by inferring it from the circumstances attending the
    killing.
3.  Homicide—Malice—"Malice Aforethought."—On a trial for
    murder, it is proper to advise the jury that "malice afore-
    thought" means a predetermination to do the act of killing
    without a legal excuse, and it is immaterial as to what time
    before the killing such a determination was formed.
4.  Homicide—Murder—"Implied Malice."—"Implied malice" is
    such as arises or may be inferred from the intentional doing
    of an unlawful or wrongful act with a wrongful purpose.
5.  Homicide—Trial—Instructions—Self-defense. —Where  there
    was no evidence that deceased made or intended an attack
    on another, a charge confining defendant's right to kill in
    his own defense was proper.

D. K. RAWLINGS and H. C. EVERSOLE for appellant.

JAMES BREATHITT, Attorney General, and TOM B. Mc-
GREGOR, Assistant Attorney General, for Commonwealth.

OPINION OF THE COURT BY JUDGE SETTLE—Affirm-
ing.

The appellant, Alex Burns, with a pistol shot and killed Abe Gilbert at the residence of Joseph Hignite, on Bullskin creek in Clay county. The indictment returned shortly thereafter by the grand jury of Clay county, against appellant for the homicide, charged him with the crime of murder, and on the trial the jury by their verdict found him guilty as charged, and fixed his punishment .at confinement in the penitentiary for life. He was refused a new trial by the circuit court, and has appealed.

The facts were that the day before the homicide appellant and Gilbert, both of whom then lived in Owsley county, the former on Bullskin creek and the latter on Squabble creek, met at Wm. Baker's on Longest creek, in Breathitt county, where they obtained several quarts of whisky. Some time in the afternoon they left Baker's, and went to the residence of a brother of Abe Gilbert, in Owsley county, where they remained a short time, and then went to the home of Abe Gilbert, arriving there in the night. After midnight they concluded to go to Joseph Hignite's in Clay county, and at once started, reaching Hignite's about or shortly before daylight. Hignite was a cousin of Gilbert, and his wife an aunt of appellant. Upon getting to Hignite's appellant and Gilbert called him to the door, and at his request they alighted from their horses and entered the house. At that time appellant was considerably under the influence of liquor, and Gilbert very drunk. As soon as they got into the house Gilbert pulled a bottle of whisky from his pocket, and proposed that the three take a drink. He and appellant drank from the bottle, but Hignite only pretended to do so. After some conversation between the parties all three of them left the house, at Hignites' suggestion, to put the

horses of the visitors in the stable and feed them. The horses were, however, turned into a pasture near the house, and the men then returned to the house to await breakfast, and on the way another drink was taken from the bottle by appellant and Gilbert, but Hignite, as before, only made a pretense of drinking.

After a short stay in the house appellant and Gilbert again went out, followed by Hignite, and Gilbert then insisted upon going to a cabin on Hignite's farm, about 100 yards from the latter's house, to see, as he said, one Isaac Gipson, who was occupying the cabin upon a previous visit made by Gilbert to Hignite. Hignite told Gilbert that Gipson no longer lived in the cabin, and that it was then unoccupied, but the latter persisted in going to the cabin, and was followed by appellant and Hignite. Upon getting to the cabin Gilbert called Gipson's name and knocked on the door. Finding the cabin empty, he again started with appellant and Hignite to the latters' house, soon stopping, however, while he and appellant, the latter partaking sparingly, took another drink from Gilbert's bottle. By that time Gilbert was so intoxicated as to be scarcely able to walk. Seeing that Gilbert was or would soon be helpless, Hignite suggested to appellant, who was far less intoxicated than Gilbert, and able to walk without apparent difficulty, that he get from Gilbert the bottle of whisky. This appellant succeeded in doing without apparent trouble, and gave the bottle to Hignite, who immediately left them for the purpose of hiding the bottle in, or behind, a nearby stable. When Hignite got to the corner of the stable he turned and looked at appellant and Gilbert to ascertain if they were watching him,

intending that they should not see him conceal the bottle. Upon turning, he discovered that they were upon their knees and engaged in a struggle. He then saw appellant take a pistol from Gilbert, and at once get upon his feet with the pistol in his hand, and hurriedly step fifteen or more feet from Gilbert. At that juncture Gilbert slowly staggered to his feet, and, commencing to draw a small knife from his pocket, said to appellant, "I want Clabe's pistol;" Clabe being his son of whom he had the day before borrowed the pistol. Seeing the attitude of the parties, Hignite told appellant to run out of the way, and then told Gilbert to come to him. Gilbert at first seemed to respond to Hignite's request by starting as if to go to him, but immediately turned in the direction of appellant, and with the knife in his hand staggered towards him. About that time Hignite saw appellant present the pistol as if about to shoot, and, being himself somewhat in line with Gilbert, and fearing for his safety if appellant shot at Gilbert, he stepped behind the stable, immediately following which he heard the report of the pistol, and, looking around the corner of the stable, saw Gilbert lying on the ground. Hignite then went to Gilbert, and finding him wounded, and as he believed, dying, called from the house a physician, Dr. Thompson, who happened to be spending the night with him. Thompson at once saw the dying man, and examined his wound, but could do nothing to relieve him. When Hignite got behind the stable, the building obstructed his view, so that he did not again see appellant or Gilbert until after the former discharged his pistol, but when he last saw them Gilbert was apparently staggering in the direction of appellant with the small pocket knife in his hand, and the latter was standing with

the pistol presented as if about to shoot; the parties being then about 15 feet apart.

The facts thus far related appear mainly from the testimony of Hignite, but are undisputed by appellant, who, however, testified as to certain alleged additional facts he claimed were unknown to Hignite, such as that Gilbert became angry at him for depriving him of the bottle of whisky, and attempted to draw a pistol, which appellant took from him, and in the struggle over which they fell to the ground; that after getting the pistol he removed some of the cartridges from it, and was engaged in removing others when Gilbert got upon his feet and started toward him with a drawn knife in his hand; that he repeatedly commanded Gilbert to stop, and backed away from him as he did so, but that Gilbert continued to advance until within 5 or 6 feet of him, whereupon he shot Gilbert believing it necessary to do so to save his own life. It is not clear from the evidence whether appellant shot Gilbert with his own pistol, or with the one he had just taken from Gilbert, but the evidence showed that appellant was then armed with his own pistol, and that it was his habit to carry a pistol.

The foregoing statement presents practically all the evidence furnished by the record, except that several witnesses testified as to conversations with appellant shortly after the homicide, in which he said he was 15 yards or feet from Gilbert when he shot him, all of which statements he denied. It should also be remarked that several persons testified as to appellant's good character, but they admitted upon cross-examination that they had known nothing of him for 3 years previous to the homicide, as during

that time he had been in the regular army of the United States, and absent from Kentucky. It is also proper to say that the record shows appellant to have been 26 years of age, and Gilbert 45, at the time of the homicide; that Gilbert was a small man, and appellant above the average in both weight and height, and much the superior of Gilbert in physical strength. It should further be observed that the record fails to show the existence of any ill feeling between appellant and Gilbert prior to the homicide.

The ground upon which appellant sought a new trial, and now asks a reversal, are: (1) That the court did not properly instruct the jury; (2) that an instruction as to murder should not have been given; (3) that the instruction as to self-defense did not correctly state the law; (4) that the verdict was not supported by the evidence.

As to the first of these grounds it is sufficient to say that the instructions so admirably state the law applicable to the facts of this case that we insert them in the opinion.

"No. 1. Gentlemen of the jury: If you believe from the evidence beyond a reasonable doubt that the defendant, Alex Burns, of Clay county, Ky., and before the finding of the indictment herein on the occasion mentioned in the evidence, willfully and feloniously shot at and wounded Abe Gilbert in the body, with a pistol loaded with powder and leaden balls, or other hard and explosive substances, so that he then and there immediately died, not in his necessary, or reasonably apparent necessary, defense, then you ought to find him guilty; guilty of willful murder as charged in the indictment herein, if you believe from the evidence beyond a reasonable doubt that such shooting and killing was done willfully and felonious-

ly and with malice aforethought; guilty of voluntary manslaughter included in the indictment herein, if you believe from the evidence beyond a reasonable doubt that such shooting at and killing was done in sudden heat and passion, or in sudden affray and without previous malice.

"No. 2. If you find the defendant guilty of willful murder, as charged in the indictment herein, you will fix his punishment at death or confinement in the penitentiary of this state for life, in your discretion according to the proof. If you find the defendant guilty of voluntary manslaughter included in the indictment herein, you will fix his punishment at confinement in the penitentiary of this state for a period of not less than 2 nor more than 21 years, in your discretion according to the proof. If you find the defendant not guilty, you will say so, and no more.

"No. 3. If you believe from the evidence that at the time the defendant shot and killed Abe Gilbert, if he did so, he believed, and had reasonable grounds to believe, that he was then and there in immediate danger of death, or the infliction of some great bodily harm at the hands of the said Abe Gilbert, and that it was necessary, or was believed by the defendant, Alex Burns, in the exercise of a reasonable judgment to be necessary, to shoot at and kill the said Abe Gilbert, in order to avert that danger, then you will acquit the defendant, upon the grounds of self-defense and apparent necessity.

"No. 4. If you have a reasonable doubt from the evidence of the defendant having been proven guilty, you will find him not guilty. Or, if you believe from the evidence beyond a reasonable doubt that he has been proven guilty, but have a reasonable doubt from the evidence as to whether he has been proven guilty

of willful murder as charged in the indictment herein, or of the lower offense, voluntary manslaughter, included in the indictment herein, you will find him guilty of such lower offense, voluntary manslaughter, and fix his punishment as stated in instruction No. 2, above, for voluntary manslaughter.

No. 5. The words 'willful' and 'willfully' as used in the indictment and the instructions herein mean intentional, not accidental or involuntary. The word 'feloniously' as used in the indictment and the instructions herein means proceeding from an evil heart or purpose, done with the deliberate intention to commit a crime. The phrase 'with malice aforethought' as used in the indictment and instructions herein means a predetermination to do the act of killing without a legal excuse, and it is immaterial as to what time before the killing such a determination was formed."

It is insisted for appellant that the evidence furnished no ground for the instruction as to murder, and that it was necessarily prejudicial to appellant. While the evidence presents many of the earmarks of a killing in a sudden affray or in sudden heat and passion, and we would be better satisfied to affirm a verdict and judgment for voluntary manslaughter, with such punishment as might have been inflicted upon appellant for that crime, we can not say that the verdict finding him guilty of murder is wholly without support from the evidence. At most the homicide was unnecessary, and, therefore, inexcusable. There was evidence upon which the jury might have rested a conclusion that the deceased was so intoxicated as to render him helpless, and, after appellant took the pistol from him, harmless, and that had appellant taken the advice of Hignite and kept out of

deceased's way after disarming him of the pistol, the latter in his drunken and helpless condition could not have kept his feet long enough to get to him with the small pocketknife in his hand, or if he had done so, that appellant, who was greatly his superior in physical strength, and was not himself sufficiently intoxicated to interfere with his walk or movements, could have disarmed him of the knife, or with a blow of his fist felled him to the ground, and thereby obviated the killing. If such a conclusion on the part of the jury as we have indicated was warranted by the evidence, the same facts may in their opinion have authorized the inference that the killing was done with malice, and, if so, it was their province to declare it murder. "The mode of proving malice is by inferring it from facts and circumstances attending the killing." Roberson's Criminal Law, sec. 178; Farris v. Commonwealth, 14 Bush, 370; Rogers v. Commonwealth, 96 Ky. 28, 27 S. W. 813, 16 Ky. Law Rep. 199; Kriel v. Commonwealth, 5 Bush, 373; Salisbury v. Commonwealth, 79 Ky. 433; Ball v. Commonwealth, 81 Ky. 664.

While it would not have been proper for the trial court to instruct the jury what acts, if any, on the part of appellant, connected with or resulting in the homicide, would authorize an inference or inferences of malice, it was proper to advise them, as was done by instruction No. 5, that "malice aforethought, as used in the indictment and instructions herein, means a predetermination to do the act of killing without a legal excuse, and it is immaterial as to what time before the killing such a determination was formed." The evidences of express malice, as well as the facts from which malice may be implied, are easily recognized. Express malice usually manifests itself in

previous or contemporaneous threats by the wrong-
doer of death or harm to his intended victim, or de-
clarations or acts indicative of his ill will toward, or
desire to inflict injury upon, him. Implied malice is
such as arises or may be inferred from the intention-
al doing of an unlawful or wrongful act with a wrong-
ful purpose. For example, the use by one of a dead-
ly weapon in the unlawful taking or attempted taking
of human life, or in unlawfully inflicting, or intending
to inflict, upon another bodily injury, is an act from
which malice is implied or may be inferred. More
broadly stated, malice will be inferred from the in-
tentional doing of any wrongful act which the per-
petrator knows will necessarily cause injury to an-
other, or which he intends shall cause injury to an-
other, though such injury may not in fact result. We
can not say that there was in this case an entire ab-
sence of facts or circumstances from which malice
on the part of appellant in taking Gilbert's life could
be inferred. If, as the jury obviously found, the kill-
ing was unnecessary and inexcusable, the act was
either murder or voluntary manslaughter. It may
be that appellant's own testimony convinced the jury
that they ought not to find him guilty of voluntary
manslaughter, for he did not claim to have acted in
sudden heat and passion in taking Gilbert's life, or
that it was done in a sudden affray. On the contrary,
his sole defense was that the killing was done in the
protection of his life and person from danger, real or
apparent, at Gilbert's hands.

We are not called upon to speculate as to the rea-
sons upon which the jury rested their .conclusion
that appellant was guilty of murder, but it is
probable that they rejected his plea of self-defense
because convinced by the evidence, beyond a reason-

able doubt, that he was in no danger from the knife of Gilbert, and had no ground, real or apparent, to believe himself in such danger when he shot him, and that, instead of taking from Gilbert the pocketknife, as the drunken and helpless condition of the latter would have permitted of his doing, or of securing his safety by following the advice of Hignite to get away from Gilbert, whose helplessness should have appealed to his sympathy and protection, he deliberately and unnecessarily shot and killed him, which act, the jury must have concluded, manifested such a wanton and reckless disregard of human life as proved it to have been the result of malice, however suddenly conceived in the mind of the slayer. Notwithstanding appellant's complaint of error in the instructions, his counsel only criticise the instruction as to the law of self-defense. The objection made to that instruction was that it confined appellant's right to shoot and kill Gilbert to his own defense, whereas, it should, according to the contention of counsel, have told the jury that if Hignite, instead of appellant, was the object of Gilbert's attack, appellant would have had the same right, under the circumstances predicated in the instructions, to shoot and kill Gilbert in defense of Hignite that he would have had to do so in his own defense. The trial court committed no error in giving the instruction in the form it now presents. If it had been given as contended for by appellant, it would have been misleading to the jury and prejudicial to the Commonwealth, as there was no evidence whatever tending to show that Gilbert made or intended an attack upon Hignite. Neither Hignite nor appellant intimated anything of the kind, and they were the only persons who could have known of such attack, had it been made.

A careful examination of the record convinces us that the rulings of the trial court are free from error. If the jury should have found appellant guilty of voluntary manslaughter, instead of murder, the mistake is one that should appeal to executive clemency as a ground for commutation of his punishment; but, as we can not say there was no evidence whatever upon which to rest the verdict finding appellant guilty of murder, the mistake, if any, is one we are without power to correct.

Wherefore, the judgment is affirmed.